UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

RICHARD O. CONBOY, ROBERT H. THUNE,
and JANET B. THUNE, derivatively on behalf
of nominal defendant Black Diamond Club,
Inc.,

                    Plaintiffs,

v.                                                    Case No.  5:08-cv-236-Oc-GRJ

BLACK DIAMOND PROPERTIES, INC. et al.,

                    Defendants.
_____/

## MEMORANDUM DECISION AND ORDER

This lawsuit arises out of the development of Black Diamond, a residential golf

community developed by Defendant Stanley Olsen in the late 1980's on a 1,239-acre

tract of land in Lecanto, Florida.  Black Diamond Club, Inc. ("Club, Inc."), a not-for-profit

Florida corporation, was formed as part of the plan for the development of Black

Diamond.  Under the plan, Black Diamond Properties, Inc. ("Properties, Inc."), a Florida

corporation, was to develop the project and to hold title to the recreational facilities until

the development was complete, at which point, Club, Inc. could exercise its right to

purchase the club facilities.

Plaintiffs, Richard O. Conboy, Robert H. Thune and Janet B. Thune, all three of

whom are resigned members of Club, Inc., filed this derivative action on behalf of Club,

Inc. alleging various wrongs by Properties, Inc., and the Governors of Club, Inc. –

Stanley C. Olsen, Marina Taylor and Joseph G. Cappuccilli –  related to the

development of Black Diamond.[1]  Following the Court's Orders on the parties' motions for summary judgment (Docs. 171, 179), the only claim remaining for trial was Count I: breach of fiduciary and other duties by Mr. Olsen, Ms. Taylor and Mr. Cappuccilli, for which, Plaintiffs seek monetary damages, equitable relief, punitive damages and expenses and fees.

A four day non-jury trial was held before the undersigned beginning on June 7, 2010.[2]  At the conclusion of Plaintiffs' case, the Court granted Defendants' Motion For Judgment on Partial Findings as to Plaintiffs' request for punitive damages.   After trial, and at the direction of the Court, the parties filed proposed findings of fact and law. (Docs. 239, 240, 241.)[3]   In accordance with Fed. R. Civ. P. 52, the following constitutes the Court's findings of fact and conclusions of law.

---

[1] Plaintiffs sought, on behalf of Club, Inc., an accounting, damages, punitive damages, declaratory relief and injunctive relief.  In their Second Amended Complaint, Plaintiffs assert five counts against Defendants: (I) Breach of Fiduciary and Other Duties; (II) Sums Wrongfully Paid To Defendant Black Diamond Properties, Inc.; (III) Declaratory Relief; (IV) Injunctive Relief; and (V) Expenses of Litigation.

[2] Prior to the parties' consent to trial before the undersigned, the District Judge granted Defendants' Motion To Strike Plaintiffs' Demand For Jury Trial. Doc. 176.

[3] Plaintiffs also filed a "Post-Trial Brief On Calculation Of Damages" (Doc. 242) to which Defendants filed a response in opposition. (Doc. 247.)

# I. <u>DISCUSSION</u>

## A. **Factual Record**

The following facts were established at trial by a preponderance of the testimony[4] and documentary evidence offered and admitted into evidence.[5]

### *<u>Development of the Club</u>*

This case involves Club, Inc., a private equity membership golf club located within a development (the "Development") known as Black Diamond in Lecanto, Citrus County, Florida.[6] The golf club consistently has been ranked in the top 100 residential golf courses in the United States.[7]

Black Diamond Properties, Inc. (the "Developer") has at all times been beneficially owned by Stanley Olsen or by entities controlled by Olsen.[8] Properties, Inc. owns the 1,239-acre tract of land upon which the Development has been built.[9] The

---

[4] Plaintiffs presented the testimony of Haines Hendry; James O'Dell; Geoffrey Greene; James Carman; Glenn Elsasser; Lawrence Laukka; Joseph Cappuccilli; Clifford Pierson; Richard Conboy; Robert Thune; Brett Hendee; Louis Plasencia; Kathy Haines; Marina Taylor; and Stanley Olsen. Defendants presented the testimony of Dennis Hillier; Stanley Olsen; Marina Taylor; and John N. Johnson, IV. Official transcripts of the trial testimony have not been filed with the Court other than the testimony on June 7, 2010 (Doc. 243) and Mr. Olsen's testimony on June 9, 2010 (Doc. 236) and June 10, 2010 (Doc. 237.)

[5] The Court will refer to Plaintiffs' and Defendants' exhibits as "PX" and "DX" followed by the appropriate exhibit number.

[6] The parties agree that Black Diamond is sometimes referred to as Black Diamond Ranch, Black Diamond Club and Black Diamond. Depending upon the context, when the parties refer to the "club" it variously means the accounting division of Properties, Inc. relating to club operations (as opposed to residential real estate operations), the physical golf facilities themselves or Club, Inc.

[7] DX-22, DX-23, DX-30, DX-31, DX-33 and DX-67; Marina Taylor Trial Testimony, June 10, 2010.

[8] Doc. 200, Joint Amended Final Pre-Trial Statement, (hereinafter "Stip.") at ¶9.I.

[9] <u>Id</u>. at ¶9.H.

tract is the subject of a plat filed in the public records of Citrus County, Florida, that dedicates the club facilities to Club, Inc. and its successors in perpetuity.[10]

Black Diamond Club, Inc., a Florida not-for-profit corporation, was formed March 5, 1987 for the purpose of taking title to and operating the Black Diamond club and facilities after ownership is transferred by Properties, Inc.  The documents establishing Club, Inc. and defining its relationship with its members and Properties, Inc. were prepared by Dennis Hillier, Esquire, who at the time was a partner with Gunster Yoakley Criser & Stewart.[11]  Mr. Hillier specializes in preparing documentation for master planned communities, and has worked on more than 1,700 developments all over the United States and offshore.[12] Geoffrey Greene testified that they selected Gunster Yoakley because it was the top firm for development of membership plans.[13]

The documents prepared by Mr. Hillier include *inter alia*, the Plan for the Offering of Memberships in Black Diamond Club, Inc. (The "Plan"),[14] the Club Purchase Agreement (the "Agreement"),[15] the Articles of Incorporation of Club, Inc. (the "Articles"),[16] the By-Laws of Club, Inc. (the "By-Laws"),[17] and the General Club Rules of

---

[10] DX-85.

[11] Dennis Hillier Trial Testimony, June 10, 2010.

[12] Dennis Hillier Trial Testimony, June 10, 2010.

[13] Doc. 243, Geoffrey Greene Trial Testimony, p. 161.

[14] DX-3.

[15] DX-4.

[16] DX-2.

[17] DX-5.

Club, Inc.[18] (hereinafter collectively the "Plan Documents.")   The Plan Documents

created for the Development by Mr. Hillier, including the Agreement that contained

certain tax advantages for Mr. Olsen, had been used in other developments and the

legality of the approach had been upheld.[19]  The Court already has held that the

Agreement is a valid and enforceable option contract.[20]

Pursuant to the Plan, Properties, Inc. "is constructing the recreational facilities to

be provided at [Club, Inc.]" and that Properties, Inc. " will own and manage the Club

facilities until the equity members elect to purchase the Club facilities."[21]  Until the

ownership, management and control of the Club facilities are transferred to Club, Inc.,

equity members are entitled to use all of the recreational facilities that include two

eighteen-hole golf courses, 9 holes of golf (that were not initially contemplated in the

Plan), a club house and other golf facilities that are owned and operated by Properties,

Inc.[22]  Properties, Inc. is responsible for all operating expenses of the club so long as it

owns the facilities.[23]

The Plan and Bylaws provide for a maximum of 750 equity memberships.  Equity

memberships were offered to persons who own a residential unit or lot in Black

Diamond and who are approved for membership.  In addition, Club, Inc. reserved the

---

[18] DX-3.

[19] Dennis Hillier Trial Testimony, June 10, 2010.  Mr. Hillier testified that this form of equity
membership is no longer used due to changes in the tax laws.

[20] Doc. 171, p. 21; Doc. 179.

[21] DX-3 at page 1 "Company Constructing Club Facilities."

[22] Id. at page 1 "Members Will Own And Manage Club After Closing Date."

[23] Joseph Cappuccilli Trial Testimony, June 8, 2010.

right to offer memberships to select persons who do not own a residential unit or lot in Black Diamond.

In the Agreement, Properties granted Club, Inc. the right and option to purchase the club facilities upon the occurrence of the earlier of either of the following conditions precedent: (i) one year after the initial sale of all of the memberships permitted to be issued by [Club, Inc.], or (ii) the Company's determination, in its sole and absolute discretion, to permit the Members of [Club, Inc.] to vote to exercise [Club, Inc.'s] option to purchase the Club Facilities prior to the initial sale of all of the Memberships.  To date, turnover has not occurred.  Thus, the Agreement remains an executory contract.

Pursuant to the Agreement, the purchase price for the Club facilities is equal to: (1) the total membership contributions received from the initial sale of all of the equity memberships permitted to be issued by Club, Inc.; (2) the portion of the membership contribution retained by Club, Inc. upon the transfer of a membership prior to the closing date, (c) the amount of the Mortgage, and (d) the cost to Properties, Inc. of the supplies and inventory on hand at the closing date.[24]

The Agreement further provides that prior to closing on the option, all membership contributions received by Club, Inc. from the issuance of memberships shall be paid promptly to Properties, Inc. as a "nonrefundable option payment" and such payments shall be the property of Properties, Inc. and used by Properties, Inc. "in any manner whatsoever in its sole and absolute discretion."[25]

---

[24] DX-4.

[25] DX-4.

6

Club, Inc.'s Directors are called "Governors." The By-Laws provide that its Governors "shall have no fiduciary or other obligation to act on behalf of the members . . . or [Club, Inc.], and it is specifically understood that said persons will act solely on behalf of [Properties, Inc.]." The Agreement provides that "neither [BDP] nor its employees, agents, officers and directors nor [Club, Inc.'s] incorporators or initial and interim Board of Governors and officers designated by [Properties, Inc.] owe any fiduciary duty to investigate, negotiate or otherwise act on behalf of the Members . . . or [Club, Inc.]"

Since its inception, Club, Inc., has been controlled by Olsen through Properties, Inc. and Olsen has been a Governor.[26] Olsen has the power to designate and remove all members of the Board of Governors.[27] Although outside Governors have been on the Board, currently only the three defendants comprise its Board.[28] Ms. Taylor became a Governor of Club, Inc. in 2004 or 2005[29] and Mr. Cappuccilli became a Governor in 2007.[30] Ms. Taylor has been employed by Properties, Inc. since 1997 and an officer of that corporation since 1999; Mr. Cappuccilli has been an employee of Properties, Inc. or

---

[26] P-1, P2; Doc. 236, Stanley Olsen Trial Testimony, p.3.

[27] Brett Hendee Trial Testimony, June 9, 2010; Doc. 236, Stanley Olsen Trial Testimony, p.3.

[28] Brett Hendee Trial Testimony, June 9, 2010; Doc. 236, Stanley Olsen Trial Testimony, pp. 6 & 11.

[29] DX-84; Marina Taylor Trial Testimony, June 9, 2010.

[30] Stip. ¶9.OO.

other Olsen owned companies since 2003.[31] The Defendants testified that the Governors frequently met informally to discuss Board business.[32]

### *Equity Memberships*

At all times, equity memberships in Club, Inc. have been sold at prices set by Olsen as owner of Properties, Inc.[33] In setting the membership price, Olsen has always relied upon surveys done by experts such as Hunter Moss & Company, the accounting firm McGladrey & Pullen, and the law firm of Hillier & Associates. In addition to relying upon surveys performed by experts, Olsen also has relied upon the advice of trusted club managers and has considered the economy and promises to members.[34] Mr. Olsen testified that the equity membership price was intended to pay the capital costs of building the golf course, clubhouse and other facilities; and was not intended to make a large profit for the developer.[35] He further testified that he always used his best judgment in setting the membership fees.[36]

---

[31] Joseph Cappuccilli Trial Testimony, June 8, 2010; Marina Taylor Trial Testimony, June 9, 2010.

[32] Joseph Cappuccilli Trial Testimony, June 8, 2010; Marina Taylor Trial Testimony, June 10, 2010.

[33] Stip. at ¶9.N; Doc. 236, Stanley Olsen Trial Testimony, p. 4.

[34] Doc. 237, Stanley Olsen Trial Testimony, pp. 16- 18; DX-27, DX-28, DX-32, DX-35, 38, 39, 43 and 50; Dennis Hillier Trial Testimony, June 10, 2010. Mr. Hillier's firm created and maintains a database with dues and membership fee information as to more than 10,000 master planned communities around the world. Dennis Hillier Trial Testimony, June 10, 2010.

[35] T. Olsen, 6-10-10, p. 16:22-17:2; p. 24:25-25:16; p. 33:24-34:4.

[36] Doc. 237, Stanley Olsen Trial Testimony, p. 23.

Club, Inc. memberships have always been sold at or below the prices of comparable clubs.[37] In 1987, Club, Inc.'s memberships were sold for $10,000.00 even though industry experts recommended a price of $16,000.00.[38] Membership prices were increased over time, until they reached their current price of $70,000.00 in January 2004.[39] Mr. Hillier testified that the 2003 fee of $65,000.00 was a "very fair price," lower than other similar clubs[40] and that the 2004 fee of $70,000 was "toward the low end" and "certainly fair and reasonable." Defendants' expert, John Johnson testified that $70,000.00 was and is a fair and reasonable membership price for a club of this caliber, and even below the price he had recommended as recently as 2007.[41]

Since January 1, 2004, a total of 128 equity memberships have been sold for $70,000.00.[42] Sales of equity memberships have dropped off since 2000. Defendants' expert, John Johnson testified that the decline in sales of lots and memberships was not a reaction to the price of memberships and dues but rather was a result of economic conditions, the ongoing litigation and Mr. Thune's website.[43]

Mr. Olsen testified that he would like to lower the price due to current economic conditions but that he is constrained from doing so by the provisions in the Plan

---

[37] Dennis Hillier Trial Testimony, June 10, 2010; DX-27; DX-28; DX-32;

[38] Stip. at ¶9.P; DX-1; Dennis Hillier Trial Testimony, June 10, 2010.

[39] Stip. at ¶9.Q.

[40] Dennis Hillier Trial Testimony, June 10, 2010.

[41] John Johnson Trial Testimony, June 10, 2010; PX-73.

[42] DX-69; Marina Taylor Trial Testimony, June 10, 2010.

[43] John Johnson Trial Testimony, June 10, 2010.

Documents guaranteeing resigning members 100% of what they paid if their membership is reissued.[44] He explained that lowering the price ultimately would saddle Club, Inc. with an unfunded liability that, after turnover, the members would be responsible for covering.[45]

Checks for the purchase of equity memberships are made payable to Club, Inc. and deposited in the Club, Inc. checking account.[46] Purchasers of equity memberships are issued a certificate representing their 1/750th ownership interest.[47] The sums paid to Club, Inc. for equity memberships and 20% or less of the sums paid to Club, Inc. for reissued equity memberships are paid to Properties, Inc. as option payments toward the purchase of the club facilities.[48]

To date, the purchasers of equity memberships have paid $31,508,604 to Club, Inc. for these equity memberships.[49] Of these total membership fees, $11,179,500 was paid by Club, Inc. to resigned members who redeemed their memberships – thus, netting Properties, Inc. $20,329,104.[50] The only asset that Club, Inc. has or has ever

---

[44] Doc. 237, Stanley Olsen Trial Testimony, pp. 19-20.

[45] Id.

[46] Stip. at ¶9.R.

[47] Stip. at ¶9.S.

[48] DX-4, p. A-2 ¶4.

[49] Stip. at ¶9.NN. In paragraph lettered "9.T" of the Stip., it incorrectly states that the purchasers of equity memberships have paid over $31,390,064 to Club, Inc.

[50] Stip. at ¶9.NN.

had or has ever received in consideration of its payments to Properties, Inc. is the Agreement and a credit against the purchase price under the Agreement.[51]

Properties, Inc. and Black Diamond Corporation (which owns Properties, Inc.) are "pass through" corporations for tax purposes, such that the gains or losses of Properties, Inc. are the gains and losses of Mr. Olsen and are reported by him and taxed to him on his personal tax return.[52]  In April 2009, for the first time, Mr. Olsen reported more than $20 million in revenue for the membership fees paid from Club, Inc. to Properties, Inc.[53]  Mr. Hendee (Mr. Olsen's tax lawyer) and Mr. Olsen had determined that transfer of the club from Properties, Inc. to Club, Inc. was imminent, and that for tax purposes, they triggered the sale or exchange of the club.  Factoring in other losses, the tax paid on the revenue was approximately $2.4 million.[54]  Mr. Olsen had made reserves to cover the tax obligation.[55]

Although, equity memberships have been sold only to owners of property in the Development, the Plan Documents permit the sale of equity memberships to people who do not own lots at the Development.[56]   A number of lots at the Development were sold without the purchaser purchasing an equity membership in Club, Inc.[57]

---

[51] Stip. at ¶9.V.

[52] Brett Hendee Trial Testimony, June 9, 2010.

[53] Id.

[54] Id.

[55] Id.

[56] Stip. at ¶9.J.

[57] Stip. at ¶9.Y.

In 2001, owners of equity memberships were informed of the so-called "disconnect" – i.e., there were fewer lots left for sale than there were unsold equity memberships in Club, Inc. Specifically, members were advised that if Properties, Inc. sold all of the remaining lots with membership certificates, there would still be 45 unsold membership certificates.[58] However, current figures show that if every future purchaser of a residential lot at the Development also purchases an equity membership, the number of sold memberships would be about 10 short of the 750 figure.[59] A total of 571 equity memberships have been sold, leaving 179 memberships to reach the "turnover" figure of 750.[60] There are 101 unsold platted lots and 68 lots that have been authorized but not yet platted.[61] Thus, if every future purchaser of a residential lot at the Development from Properties, Inc. also purchases an equity membership the number of sold memberships would be about 10 short of the 750 figure once all lots owned by Properties, Inc. are sold.[62] However, it is not impossible to reach the 750 figure because there are a number of lots in the Development whose owners do not own a membership and the Plan Documents allow memberships to be issued to persons outside the Development.[63]

_____

[58] PX-7.

[59] Stip. at ¶9.BB.

[60] Stip. at ¶9.AA.

[61] Stip. at ¶9.Z.

[62] Stip. at ¶9.BB.

[63] Stip. at ¶9.Y, ¶9.J.

Pursuant to the by-laws, equity memberships can only be sold back to Club, Inc. and Club, Inc. will buy back a membership only if the selling member has a buyer willing to pay the current price set by Properties, Inc. for the membership or under circumstances of extraordinary hardship.[64]  When a purchaser of a reissued equity membership (as opposed to an initial equity membership) pays Club, Inc. the price (currently $70,000.00), eighty percent or more of the payment goes to the person selling the membership and twenty percent of the purchase price is transferred from Club, Inc. to Properties, Inc.[65]  There are presently 156 owners of equity memberships who have ceased paying dues and have put their equity memberships on a waiting list for resale.[66] Of these people, eighty-eight own lots at the Black Diamond development and eleven of those people have the right to sell their membership with their lot when their lot is sold.[67]

### *Membership dues*

Dues and other charges like golf cart fees and food and beverage charges are billed to the owners of equity memberships who continue to pay dues for the privilege of playing golf and using the club facilities.[68]  Currently, there are 394 dues-paying members of the Club.[69]

---

[64] Stip. at ¶9.EE.

[65] Stip. at ¶9.FF.

[66] Stip. at ¶9.GG.

[67] Id.

[68] Stip. at ¶9.KK.

[69] Stip. at ¶9.JJ.

In setting dues, the Board of Governors has always relied upon surveys of comparable dues performed by experts like the accounting firm of McGladrey & Pullen and the law firm of Hillier & Associates.[70]  The Governors also considered the club's operational expenses, the members wishes, the economy and recommendations of the general manager.[71]  Mr. Olsen testified that in setting dues he was always acting in his best judgment.[72]  Mr. Johnson offered expert testimony that Black Diamond's dues have always been set at levels within the range of dues charged at comparable clubs in Florida.[73]  Although the Governors endeavored to have the dues meet operational expenses,[74] according to Mr. Hendee, Properties, Inc. has suffered losses in the amount of $6,952,549.00 from the operation of the club facilities since inception.[75]

At trial, Plaintiffs elicited testimony regarding the so-called April 2000 "Blue Letter" in which the dues were increased from about $3,400.00 to about $5,000.00 without the prior consent or knowledge of the general manager of Properties, Inc., Jim Carman.[76]  Mr. Carman testified that the members of Club, Inc. were shocked and outraged at the increase.[77]

---

[70] DX-27; DX-35; DX-38; DX-43; Doc. 237, Stanley Olsen Trial Testimony, p. 9; Marina Taylor Trial Testimony, June 10, 2010.

[71] Doc. 237, Stanley Olsen Trial Testimony, pp. 9-13.

[72] Doc. 237, Stanley Olsen Trial Testimiony, p. 15.

[73] John Johnson Trial Testimony, June 10, 2010.

[74] Marina Taylor Trial Testimony, June 10, 2010.

[75] DX-83.

[76] James Carman Trial Testimony, Doc. 243, pp. 190-93, 200.  The "Blue Letter" was not introduced into evidence.

[77] Id. at 191.

### *Investment in the Facilities*

According to Bret Hendee, Olsen's tax attorney, a total of $20,472,949 has been invested in the club facilities.[78]   Mr. Hendee testified that since 1989 he has kept the records of Properties, Inc.'s investments in order to facilitate the preparation of tax returns.  From his records and those of Properties, Inc. and Olsen, he prepared summaries showing the actual amounts of cash and the book value of property provided in kind to create the club facilities to be transferred under the Agreement.

Plaintiffs' expert, Mr. Haines Hendry, a real estate appraiser, testified that using the sales comparison approach, the fair market value of the club facilities as of June 26, 2009, was between $10,350,000 and $11,250.00.[79]  Mr. Hendry testified that the value of comparable golf clubs began to drop in 2006.[80]

---

[78] Brett Hendee Trial Testimony June 9, 2010; DX-78.  Defendants offered DX-78 as a summary under Rule 1006, Federal Rules of Evidence.  Prior to trial, Plaintiffs filed their Rule 1006 Motion For Production Of Source Documents (Doc. 225) regarding DX-78 and DX-83, both of which documents Defendants sought to admit as summaries pursuant to Rule 1006.  At trial, Plaintiffs objected to the admission of DX-78 under Rule 1006 but withdrew his Rule 1006 objection as to DX-83.  The Court overruled the objection and **DENIED** Plaintiff's Rule 1006 Motion For Production Of Source Documents (Doc. 225) for three reasons.  First, pursuant to Rule 1006, the party offering the summary is required to produce to the other side and make available the documents upon which the summary was made.  Mr. Hendee testified that when he prepared the summary, he took the numbers in the attachments and put them into the summary format.  Second, any argument that the attachments themselves were summaries is without merit because Mr. Hendee testified that they were business records, and thus, are an exception to hearsay.  Finally, further backup documents to the attachments were produced and made available for inspection by Plaintiffs.

[79] Doc. 243, Haines Hendry Trial Testimony, pp.101-02; PX-56 (Appraisal Report by Hendry Real Estate Advisors, Inc.)

[80] Doc. 243, Haines Hendry Trial Testimony, pp. 114-15.

### *Early Turnover*

Mr. Olsen testified that he would like to sell out the membership or affect an early turnover.[81]    In a letter to property owners dated November 28, 2003, Mr. Olsen stated that momentum was at its peak during the years of 1997-2000, and that while he was very pleased by the pace of sales, he was concerned that, "at that pace, turnover appeared imminent and the membership did not have a cadre of members experienced in the operation of Black Diamond, nor was the revenue flow from operations and dues adequate to maintain the facilities at their current standards when Development Company subsidization ceased."[82]    At trial, Mr. Olsen confirmed that while he had become concerned in 2000 that Club, Inc. would sell 750 equity memberships too quickly, his concern was that the members were not ready to take over.[83]

Over the years, two different groups of members of Club, Inc. were formed to facilitate an early turnover of the club facilities to Club Inc. – i.e., the Member Representative Committee ("MRC") and the so-called "Transition Committee" or "Long Range Planning Committee" ("LRPC.")[84]    While progress was made in both groups, final agreement was not reached because of concerns about financial viability of Club, Inc. after turnover, including guarantees of minimum numbers of dues paying members, the potential impact of pending litigation and entitlement to proceeds of unissued

---

[81] Doc. 237, Stanley Olsen Trial Testimony, p. 20.

[82] PX-96.

[83] Doc. 236, Stanley Olsen Trial Testimony, pp. 14-15; Marina Taylor Deposition, December 15, 2009, page 1750.

[84] Clifford Pierson Trial Testimony, June 8, 2010.

memberships after turnover.[85]   These committees were not provided detailed financial information of how much money had been paid by Club, Inc. to Properties, Inc. or the capital expenditures for construction of the facilities.[86]

Mr. Olsen has also contemplated selling the entire project to a successor developer.  In 2006, Properties, Inc. entered into negotiations with a successor developer LandMar, but Landmar subsequently backed out of the deal and later filed for bankruptcy.[87]   Recently, Properties, Inc. hired the Plasencia Group to assist in identifying revenue enhancement opportunities, expense reduction opportunities and the search for a successor developer or owner of Black Diamond.[88]  The Plasencia Group has not been told a price that Mr. Olsen seeks for the Development nor has the Plasencia Group suggested a price.[89]

### *Plaintiffs*

On November 1, 1997, Conboy purchased an equity membership in Club, Inc. for $35,000.00.[90]  The Thunes purchased three equity memberships in Club, Inc. – one on

---

[85] Clifford Pierson Trial Testimony, June 8, 2010; Doc. 237, Stanley Olsen Trial Testimony, June 10, 2010, pp. 20-21; Marina Taylor Trial Testimony, June 10, 2010.

[86] Clifford Pierson Trial Testimony, June 8, 2010.

[87]  James O'Dell Trial Testimony, Doc. 243 at pp. 118-122; Marina Taylor Trial Testimony, June 10, 2010.

[88] Joseph Cappuccilli Trial Testimony, June 8, 2010; PX-77; Louis Plascensia Trial Testimony, June 9, 2010.

[89] Louis Plascensia Trial Testimony, June 9, 2010.

[90] Stip. at ¶9.LL.

September 11, 1998, for $35,000; and two on December 23, 1998, for $40,000 each.[91]

The Thunes received the Plan Documents in 1998 when they executed purchase and

sales agreements as well as a construction agreement to build their home.[92]

Prior to filing this action, Conboy and the Thunes resigned their memberships in

Club, Inc. To date, Mr. Conboy, the Thunes and more than forty other owners of equity

memberships have served derivative demands on Club, Inc.,[93] to which Club, Inc. has

served responses.[94]

In December 2000, when Mr. Conboy resigned his membership, he sent Ms.

Taylor his membership certificate and advised her in writing that his "Lot #58, Belmont

Dunes Village is for sale and have stipulated the lot and membership must be sold

together."[95] Ms. Taylor responded by letter stating, "[your] letter states that your lot is

for sale, and that the sale is contingent upon the buyer purchasing a membership in the

Club. In this case, at the time of closing, the transfer of the membership will occur

pursuant to the Club By Laws."[96] Conboy never retracted this written directive nor did

he advise Club, Inc. in writing, or otherwise, that he did not want his membership sold

---

[91] Stip. at ¶9.MM.

[92] DX-7; DX-10; DX-12; and DX-14.

[93] PX-81.

[94] PX-82.

[95] DX-20.

[96] PX-53.

with his lot.[97]  Mr. Conboy has not paid dues for Black Diamond in more than ten years.[98]

On April 22, 2010, Mr. Conboy entered into a contract to sell Lot 58, Bermuda Dunes Village in Black Diamond Ranch to Michael S. Zatzman.[99]  The contract and addendum were prepared by Black Diamond Realty, Inc.  Mr. Conboy noted on the contract that "the Seller, separate from this contract is not transferring a membership right in Black Diamond Club, Inc. to the Purchaser."[100] Mr. Conboy and the listing agent, Kathy Haines testified that the sale of Mr. Conboy's lot did not include an offer for sale or transfer of Mr. Conboy's equity membership in Black Diamond Club, Inc.[101]  On May 17, 2010, Mr. Conboy closed on the sale of his lot to Mr. Zatzman.  Ms. Taylor testified she saw the contract but could not remember whether she looked at it before or after the transaction.[102]

On May 18, 2010, Club Inc. reissued Conboy's membership certificate number to Mr. Zatzman and sent Mr. Conboy a cashier's check for $56,000.00 – representing 80% of the amount of the membership contribution currently charged by Club, Inc.[103]  Mr. Zatzman paid $70,000.00 for his equity membership, which resulted in a net of

---

[97] Richard Conboy Trial Testimony, June 8, 2010.

[98] Richard Conboy Trial Testimony, June 8, 2010.

[99] PX-152.

[100] Richard Conboy Trial Testimony, June 8, 2010.

[101] Richard Conboy Trial Testimony, June 8, 2010; Kathy Haines Trial Testimony, June 9, 2010.

[102] Marina Taylor Trial Testimony, June 10, 2010.

[103] Marina Taylor Trial Testimony, June 10, 2010; DX-71.

$14,000.00 for Properties, Inc.[104]  Conboy did not open the envelope purportedly containing the cashier's check and attempted to return the unopened envelope to Defendants at trial.

## B.    Legal Analysis

### *Standing*

Shortly before trial, Defendants filed a motion to dismiss the claims of Mr. Conboy. (Doc. 198.)   Defendant argues that Mr. Conboy cannot meet the prerequisites to bring a derivative action because his equity membership recently was repurchased and transferred  – and thus, he has been divested of his equity interest in Club, Inc.

Rule 23.1 Federal Rule of Civil Procedure authorizes only "shareholders or members of a corporation . . . [to] bring a derivative action to enforce a right that the corporation . . . may properly assert but has failed to enforce."  Plaintiffs must be shareholders or members of the corporation on whose behalf they have brought suit at the time they have filed the suit and continuing through the life of the action.[105]

Defendants previously moved for summary judgment against all Plaintiffs for lack of standing because they had resigned their equity memberships prior to filing this action. The Court denied the motion and found that despite their resignations, Plaintiffs retained an equity interest in Club, Inc. because of Club, Inc's obligation to buy their

---

[104] Marina Taylor Trial Testimony, June 10, 2010.

[105] Schilling v. Belcher, 582 F.2d 995, 999-1000 (5th Cir. 1978.)

memberships back.[106]  The Court specifically noted that Defendants had presented no evidence that Plaintiffs' membership certificates had been repurchased.

When Mr. Conboy resigned his membership in December 2000, he sent Ms. Taylor his membership certificate and advised her in writing that his lot and membership must be sold together.[107]  While Mr. Conboy contends that it should have been obvious based on the pendency of this lawsuit that he did not want to sell his membership, it is undisputed that Mr. Conboy never retracted this written directive nor did he advise Club, Inc. in writing, or otherwise, that he did not want his membership sold with his lot.[108] Accordingly, in transferring the membership to Mr. Zatzman, Club, Inc. merely was following the written directive of Mr. Conboy.   Moreover, pursuant to Article 10, §10 of the By-Laws, when Mr. Conboy resigned, he put his membership on the list for sale and only Club, Inc. had the right to sell it.  Once Club Inc. transferred the membership to Mr. Zatzman pursuant to the By-Laws and issued a cashier's check to Mr. Conboy he was no longer a resigned member of Club, Inc.   Therefore, Mr. Conboy no longer had standing to assert derivative claims on behalf of Club, Inc.

Plaintiffs argue that the Court, nevertheless, should fashion an equitable exception to the standing requirements of Rule 23.1 because Defendants "attempted to moot the standing of Mr. Conboy" in efforts to "interfere with accountability to [Club, Inc.] for the alleged breached of fiduciary duties and reflects again decisions to put the

---

[106] Doc. 48.

[107] DX-20.

[108] Richard Conboy Trial Testimony, June 8, 2010.

personal interests of the governors ahead of the interests of [Club, Inc.] and its owners."[109]   Plaintiffs cite cases for the proposition that there is an equitable exception to the standing requirements of Rule 23.1 where plaintiffs lose shareholder status as a result of the alleged misconduct of defendants, and the complained of wrongful conduct forms the basis of plaintiff's derivative claims.[110]   Here, while Plaintiffs suggest that transferring the membership was gamesmanship, the transfer of the membership does not form the basis of the derivative claims. Thus, the cases cited by Plaintiffs do not suggest that, under the facts of this case, an equitable exception to the requirements of Rule 23.1 is warranted.

Accordingly, Defendants Motion To Dismiss (Doc. 198) is due to be **GRANTED**. Mr. Conboy is dismissed as a party plaintiff for lack of subject matter jurisdiction.

The dismissal of Mr. Conboy as a derivative plaintiff, however, makes no difference to the outcome of this case because the inclusion of Mr. Conboy merely effects the earliest date the derivative plaintiffs could challenge the conduct of Defendants. Thus, the practical effect of the dismissal of Mr. Conboy's claims is that the remaining derivative plaintiffs, the Thunes, will have standing only to challenge wrongs that allegedly occurred after they purchased the first of their three memberships in 1998 – and not in 1997 when Mr. Conboy bought his membership. As discussed below,

---

[109] Doc. 241, p.23.

[110] Plaintiffs cite  Keyser v. Commonwealth Nat'l Fin. Corp., 120 F.R.D. 489, 493 (M.D. Pa. 1998) and  Miller v. Steinbach, 268 F.Supp. 255, 267 (S.D.N.Y. 1997.)  In both cases, the court found an equitable exception applicable where the plaintiffs/shareholders who lost stock due to a merger alleged that the surviving corporation participated in wrongdoing during the events leading to the merger. Plaintiffs also cite Kona Enterprises, Inc. v. Estate of Bishop, 51 F.Supp.2d 1048, 1054 (D. HI.1998) in support of their position.  However, the Kona Court found that an equitable exception to Rule 23.1 standing was not applicable on facts of that case.

22

however, Plaintiffs have failed to establish that Defendants breached any fiduciary duties at any time, including in 1997.

### ***Punitive Damages***

At the conclusion of Plaintiffs' case, the Court granted Defendants' Motion For Judgment on Partial Findings as to Plaintiffs' request for punitive damages.

The Court previously held that to the extent Plaintiffs' claims are based upon violations of duties imposed by Chapter 617, the statute does not provide for the award of punitive damages and, thus, punitive damages would not be recoverable for these claims.[111] Punitive damages could be recoverable, however, under Florida law for a breach of common law fiduciary duties.[112]

While an intentional tort does give a party a right to raise a claim for punitive damages, the party has a very high burden of showing, by "clear and convincing evidence, [ ] that the defendant was personally guilty of intentional misconduct or gross negligence." To demonstrate intentional misconduct, the plaintiff must show "the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." In this case the Plaintiffs failed to offer any evidence that came remotely close to meeting this very high standard that is required for punitive damages. Indeed, when asked by the Court, counsel for Plaintiffs was unable to direct the Court to any evidence

---

[111] Doc. 171.

[112] See e.g., Wayne Frier Home Center v. Cadlerock Joint Venture, LP, 16 So.3d 1006 (Fla. Dist. Ct. App. 2009); Mortellite v. American Tower, LP, 819 So.2d 928, 934 (Fla. Dist. Ct. App. 2002.)

showing anything even suggesting intentional misconduct or gross negligence. As such, the Court granted judgment in favor of Defendants on Plaintiffs' claim for punitive damages in Count I of the Second Amended Complaint.

### *Alleged Breaches of Fiduciary Duties*

After the Court's Orders on Summary Judgment, the only claim remaining for trial was Count I: breach of fiduciary and other duties by Mr. Olsen, Ms. Taylor and Mr. Cappuccilli. At trial, Plaintiffs primarily focused on their theory that Mr. Olsen obtained a "secret" profit from transactions between himself or his affiliates and Club, Inc. Plaintiffs also asserted, to a lesser degree, that Defendants took actions to prevent the turnover of the club facilities to Club, Inc.

While the parties agree that Chapter 617, Florida Statutes governs the operation of Florida not-for-profit corporations, Plaintiffs contend that there are additional common law fiduciary duties separate from those encompassed in Chapter 617. While the Plaintiffs failed to point the Court to any Florida law supporting this proposition, the Court need not resolve whether common law duties exist beyond those identified in the statutes, because the duties at issue in this case are the same under Chapter 617 and the common law.[113]

Under §617.0830, a director of a not for profit corporation has the duty to discharge his duties: (i) in good faith, (ii) with the care an ordinarily prudent person in like position would exercise under similar circumstances, and (iii) in a manner he or she

---

[113] Likewise, the Court need not resolve Defendants' argument that Defendants have not assumed any further common law duties based on the disclaimers of fiduciary duty contained in the Agreement and By-Laws. Doc. 240 at 22, ¶33.

reasonably believes to be in the best interests of the corporation.[114]  Consistent with the

"business judgment rule" the statute provides that if the director performs his duties in

compliance with these standards the director is not liable for the actions taken.[115]

"[D]irectors are protected by the [business judgment rule under Florida law], no matter

how poor their business judgment, unless they acted fraudulently, illegally, oppressively,

or in bad faith."[116]

While directors may not engage in self-dealing, it is not inappropriate, *per se*, for

a director to derive personal benefit from a transaction. Indeed, a so-called "conflict of

interest transaction" will not be void or voidable if there is disclosure or the transaction is

fair and reasonable to the corporation. It is a "cardinal principle" that a director will not

be allowed to make an undisclosed profit adverse to the interests of the corporation, nor

will he be permitted to acquire for his own advantage interests adverse or antagonistic

to the corporation.[117]

Section 617.0832, which governs Directors "conflicts of interest" provides in

pertinent part:

> (1)      No contract or other transaction between a corporation and one or
> more of its directors or any other corporation, firm, association, or entity in which
> one or more of its directors are directors or officers or are financially interested
> shall be either void or voidable because of such relationship or interest, because
> such director or directors are present at the meeting of the board of directors or

---

[114] Fla. Stat. § 617.0830(1)(a)-(c).

[115] Fla. Stat. § 617.0830(4).

[116] In re Bal Harbour Club, Inc., 316 F.3d 1192, 1195 (11th Cir. 2003)(quoting FDIC v. Stahl, 89 F.3d 1510, 1517 (11th Cir. 1996.))

[117] U.S. v. De La Mata, 266 F.3d 1275, 1297 (11th Cir. 2001)(citing Independent Optical Co. v. Elmore, 289 So.2d 24, 25 (Fla. Dist. Ct. App. 1974.))

a committee thereof which authorizes, approves, or ratifies such contract or transaction, or because his or her or their votes are counted for such purpose, if:

(a)     The fact of such relationship or interest is disclosed or known to the board of directors or committee which authorizes, approves, or ratifies the contract or transaction by a vote or consent sufficient for the purpose without counting the votes or consents of such interested directors;

(b)     The fact of such relationship or interest is disclosed or known to the board of directors or committee; **or**

(c)     The contract or transaction is fair and reasonable as to the corporation at the time it is authorized by the board, a committee, or the members.

(emphasis added.)


### *Secret Profit*

Plaintiffs' principal theory at trial was that Mr. Olsen breached his fiduciary duties by making a secret profit on sums transferred from Club, Inc. to Properties, Inc. that were transferred "for the purpose of paying the capital cost of the golf facilities that [Club, Inc.] was created to own."[118]

All monies transferred from Club, Inc. to Properties, Inc. have been transferred pursuant to the Agreement, which the Court already has found to be valid and enforceable. Plaintiffs contend that Mr. Olsen's "secret profit" is equal to the difference between the actual cost to construct the Black Diamond facilities and the membership fee payments that have been transferred from Club, Inc. to Properties, Inc.

At the most basic level, Plaintiffs have failed to establish by a preponderance of the evidence that Mr. Olsen has made any profit on sums transferred from Club, Inc. to

---

[118] Doc. 241 at 19.

Properties, Inc.  Mr. Hendee testified at trial that a total of $20,472,949.00 has been invested by Mr. Olsen in the club facilities.[119]  By comparing the amount invested by Olsen through Properties, Inc. with the amount received by Olsen through Properties, Inc. ($20,329,104.00) as of the time of trial, Olsen had invested $150,000.00 more in the club facilities than had been paid to Properties, Inc. Moreover, Defendants offered unrefuted evidence that since inception Properties, Inc. has suffered losses in the amount of $6,952,549.00 from the operation of the club facilities.

After trial, in efforts to rebut this evidence, Plaintiffs filed a color-coded version of PX-154 – composite source documents for DX-78[120] – in which Plaintiffs' counsel highlighted entries that "appear to describe either the cost of land or improvements to real estate or items with useful lives of fifteen years or longer and that are not items listed on the tangible tax return."[121]  Plaintiffs contend that this analysis "supports a finding that the cost to construct the Black Diamond Club Facilities was no more than $17,617,268.61."[122] This highlighted document is Plaintiffs' sole basis for concluding that Properties, Inc. has been paid $2,551,770.39 more than the fair value for the facilities – i.e., land, improvements, real estate, and tangible property used in the operation of facilities (not including inventory of bars, restaurants and pro shops.)

---

[119] Brett Hendee Trial Testimony June 9, 2010; DX-78.

[120] DX-78 is the summary document prepared by Mr. Hendee showing the total investment in club facilities as $20,472,949.00

[121] Doc. 242 at 3.

[122] Id.

Plaintiffs also contend that Mr. Olsen obtained an unspecified "substantial collateral benefit by deferring any recognition of the money received from [Club, Inc.] until April 2009, and by deducting depreciation of the capital expenditures to construct the club facilities against other income, thereby allowing Mr. Olsen to save millions of dollars of income taxes."[123]

There are several problems with Plaintiff's theory. While it is true that Mr. Olsen was able to defer making the $2.7 million tax payment on the revenue for membership fees until April 2009 – when he and Mr. Hendee determined that Mr. Olsen had to realize a sale for tax purposes, Mr. Hendee testified that Mr. Olsen previously had placed monies in reserves in excess of this amount to cover this tax liability. Thus, while Mr. Olsen may have received some benefit from deferring payment of taxes the benefit, if any, is impacted by the fact that Olsen had placed monies in excess of the amount he actually paid in a reserve. More importantly, whether or not Olsen did reap some tax benefits from deducting depreciation for capital expenditures, has no bearing upon whether Club, Inc. sustained damages. Because this case is a shareholder derivative action the Plaintiffs are required to prove damages to Club, Inc. Whether Mr. Olsen may have received some benefit from deferred payment of taxes makes no difference whatsoever to Club, Inc. because Club, Inc. owned no property and thus was not entitled to deduct depreciation of the capital expenditures. In short, the fact that Mr. Olsen deducted depreciation of the capital expenditures did not and could not cause any damage to Club, Inc.

---

[123] Doc. 241 at p. 12, ¶17.

Based upon the foregoing, Plaintiffs failed to establish based upon a preponderance of the evidence that Mr. Olsen profited from the monies transferred from Club, Inc. to Properties, Inc.

In addition to Plaintiffs' failure to demonstrate that Olsen profited from the monies transferred from Club, Inc. to Properties, Inc., even if Plaintiffs had demonstrated that Mr. Olsen had profited in some manner from the Agreement, Plaintiffs failed to establish that Olsen violated his fiduciary duties because his interest in the Agreement was fully disclosed and the Agreement was fair and reasonable to Club, Inc.

Turning first to disclosure, there is no question that the Governors and members of Club, Inc. were well aware of the Agreement between Properties, Inc. and Club, Inc. Plaintiffs nevertheless argue that the Governors were required to disclose to members detailed financial information on the total monies paid to Properties, Inc. and the cost to build the facilities. However, neither Florida law nor the Plan Documents impose such an affirmative duty on the Governors. Nor was evidence adduced at trial that members had attempted to obtain from Club, Inc. (and not Properties, Inc.) such financial information but their request was denied.

In addition, Defendants established based upon a preponderance of the evidence that the payments made from Club, Inc. to Properties, Inc. were fair and reasonable. All payments were made pursuant to the terms of the valid and enforceable Agreement. While Plaintiffs contend that it would be more "fair and reasonable" for Properties, Inc. to be paid only the capital costs for the land and improvements and the present value of the tangible property, those are not the terms of the Agreement. More importantly, as discussed above, Plaintiffs failed to establish by a preponderance of the evidence that

29

Mr. Olsen obtained any profit – and thus, using Plaintiffs' own formula for calculating "secret profit" – Club, Inc. has not yet been damaged.

Finally, there is no question that Mr. Olsen has complete discretion to set the price of membership fees, which directly impacts the total price paid by Club, Inc. under the Agreement. However, the unrefuted evidence at trial was that the equity memberships always have been sold at or below the prices of comparable clubs and the price has always been fair and reasonable. Mr. Olsen testified that in setting the price he used his best judgment and relied upon surveys done by legal counsel, public accountants and other persons who had expertise in master planned communities, as well as the advice of trusted club managers. As such, the Court has no trouble finding that Mr. Olsen acted in good faith in a manner he reasonably believed to be in the best interest of Club, Inc. in setting the price of equity memberships.

For all of these reasons, the Court concludes that Plaintiff failed to prove by a preponderance of the evidence that Mr. Olsen breached his fiduciary duty by obtaining an alleged "secret profit."

### Preventing Turnover

The other theory advanced at trial was that Defendants had breached their fiduciary duties by taking actions to frustrate the Agreement and prevent the turnover of the club facilities from Properties, Inc. to Club, Inc.

Plaintiffs contend that Mr. Olsen's desire to delay turnover is evidenced by the November 28, 2003 letter in which Mr. Olsen expressed concerns about turnover

happening too quickly.[124]  However, Plaintiffs' attempt to ascribe evil intentions to this letter was refuted fully by Mr. Olsen who clearly explained, both in the letter and at trial, that his concern was not with early turnover *per se*, but rather, that the membership was not ready to take over the facilities and that the revenue flow from operations and dues was not adequate to cover the operational costs.  At trial, Mr. Olsen unequivocally testified that he was not attempting to hold on to Black Diamond; but rather he would like to sell out the memberships or affect an early turnover.[125]  To that end, there have been at least two member committees that have been formed to facilitate early turnover and the evidence shows that Mr. Olsen and his management team worked in good faith toward early turnover.  Based on Mr. Olsen's explanation and the attempts at early turnover, Plaintiffs have failed to carry their burden on this claim.

Plaintiffs further contend that because of the concern in 2000 that turnover was imminent, the Defendants raised the price for equity memberships and dues which produced a "drastic slowing of memberships," a circumstance not in the best interests of Club, Inc.[126]  Plaintiffs further assert that Defendants have continued to raise the price of memberships until sales "grounded to a halt."[127] As discussed above, the unrefuted evidence at trial established that, in setting the price of equity memberships, Mr. Olsen always acted in good faith in a manner he reasonably believed to be in the best interest of Club, Inc.  He relied upon surveys done by legal counsel, public accountants and

---

[124] PX-96.

[125] Doc. 237, Stanley Olsen Trial Testimony, p. 20.

[126] Doc. 241, p. 14, ¶20.

[127] Doc. 241, p. 15, ¶23.

other persons who had expertise in master planned communities, as well as the advice of trusted club managers.   Further, it is undisputed that equity memberships always have been sold at or below the prices of comparable clubs and the price has always been fair and reasonable.

Likewise, as to membership dues, there was no evidence offered by Plaintiffs suggesting that Defendants breached their fiduciary duties.  Rather, the evidence shows that Defendants acted in good faith in a manner they reasonably believed to be in the best interest of Club, Inc. and relied upon information, opinions, and reports presented to them by competent and reliable employees, accountants, lawyers and accountants. It is unrefuted that the dues have always been set at levels within the range of dues charged at comparable clubs in Florida and Plaintiffs did not offer any evidence that Properties, Inc. profited from the dues.

While the price of memberships and dues might have had some impact on the pace of sales, there is no question that a host of other issues have impacted the sale of membership and lots at Black Diamond,  including the economy, the "dot com bust," the ongoing member litigation and Mr. Thune's website.[128]

Plaintiffs also suggested that  Mr. Olsen has breached his fiduciary duties by refusing to lower the price of memberships in light of the economy.  However, Mr. Olsen's unrefuted testimony was that although he would like to lower the price due to current economic conditions, he is constrained from doing so by the provisions in the Plan Documents guaranteeing resigning members 100% of what they paid if their

---

[128] John Johnson Trial Testimony, June 10, 2010.

membership is reissued. Mr. Olsen explained that lowering the price would saddle Club, Inc. with an unfunded liability that, after turnover, the members would need to make up with dues or assessments.

At trial, Plaintiffs elicited testimony regarding the so-called April 2000 "Blue Letter" in which the dues were increased without the prior consent or knowledge of the general manager of Properties, Inc., Jim Carman.[129] While Mr. Carman testified that the members of Club, Inc. were shocked and outraged at the increase, no evidence was adduced that the dues exceeded a level that was fair and reasonable, that the dues were in excess of the dues charged at comparable clubs, or that Properties, Inc. profited.

Plaintiffs also contend that the Governors created the so-called "disconnect" between the number of unsold lots and the number of unissued memberships in efforts to prevent the sale of the 750 memberships necessary to trigger turnover. While there were past concerns about reaching the 750 figure, it is now undisputed that the figure can be reached through the sale of equity memberships to: the ultimate purchasers of the remaining unsold platted and unplatted lots; owners of lots who currently do not own a membership; and persons who live outside the Development. More importantly, Plaintiffs did not introduce any evidence suggesting that this "disconnect" was intentional or that the Defendants were acting in bad faith to frustrate performance of the Agreement.

---

[129] James Carman Trial Testimony, Doc. 243, pp. 190-93, 200. The "Blue Letter" was not introduced into evidence.

Finally, Plaintiffs assert that Defendants violated their fiduciary duties by failing to obtain a security interest in the club facilities to protect Club, Inc. from claims of creditors of Properties, Inc. Plaintiffs argue that the failure to do so has served the interests of Properties, Inc. and has placed the $20 million investment by Club, Inc. in the property at risk. While this theory was never advanced before trial – as was the case with Plaintiffs' other theories – Plaintiffs failed to offer any evidence to support it. To the contrary, Defendants introduced evidence debunking the basis for this theory. Mr. Hillier testified that it would not be the standard practice in the industry to create "security instruments" to protect the security interests of Club, Inc.[130]  Thus, structuring the transaction without a security interest was consistent with industry practice at the time. Moreover, the tract on which Black Diamond is located is the subject of a plat filed in the public records of Citrus County, Florida, that dedicates the club facilities to Club, Inc. and its successors in perpetuity.[131]  Finally, to the extent a successor developer is found, the developer would take title to the Development subject to the Agreement, unless it obtains a concession by votes of the members of Club, Inc.[132]   The Court, therefore, concludes that the evidence demonstrates that Defendants have acted reasonably in looking out for Club Inc.'s interest in the facilities.

Accordingly, for all of the reasons discussed above, the Court has no trouble finding that Defendants have not breached their fiduciary duties to Club, Inc.  Indeed,

---

[130] Dennis Hillier Trial Testimony, June 10, 2010.

[131] DX-85.

[132]  Joseph Cappuccilli Trial Testimony, June 8, 2010;  Louis Plascensia Trial Testimony, June 9, 2010.

Defendants established by a preponderance of the evidence at trial that they acted in good faith and in a manner that they reasonably believed to be in the best interest of Club, Inc.  Because there simply is no evidence suggesting that any of the Defendants acted fraudulently or in bad faith the Defendants' actions are protected from liability under the business judgment rule.[133]

### *Statute of Limitations*

Plaintiffs' claims for breach of fiduciary duty suffer from a further problem. Any claims for breach of fiduciary duty are limited by the statute of limitations.  This action was filed by Plaintiffs on June 13, 2008.  Florida Statutes §95.11(3) provides a statute of limitation period of four years for actions founded on breach of fiduciary or other statutory duties.[134]  Thus, all alleged acts or omissions that occurred prior to June 13, 2004 are barred and cannot form a basis for a claim in this case.

Contrary to Plaintiffs' assertion, the continuing torts doctrine does not apply to save their claims. Florida law recognizes an exception to the general statute of limitation for torts that are continuing in nature.[135]  Under the continuing torts doctrine, the statute

---

[133] The majority of the Court's discussion has focused upon the actions of Mr. Olsen and not upon the actions of Ms. Taylor or Mr. Capuccilli. The reason for this is simple. During four days of trial Plaintiffs failed to introduce one shred of evidence pointing to any conduct by Ms. Taylor or Mr. Cappuccilli which was questionable or the focus of any of their claims. Indeed, Ms. Taylor and Mr. Capuccili did not even become directors of Club, Inc. until 2005 for Ms. Taylor and 2007 for Mr. Capuccilli. Apparently, the only basis for suing Taylor and Cappuccilli was the fact that they held positions as Governors. As such judgment in favor of Taylor and Cappuccilli as to all claims against them is due to be entered because there simply was no evidence introduced that either of these Defendants engaged in any conduct which could support a claim that they breached any fiduciary duties owed to Club, Inc..

[134] Halkey-Roberts Corp. v. Mackal, 641 So.2d 445, 447 (Fla. Dist. Ct. App. 1994.)

[135] Laney v. American Equity Inv. Life Ins. Co., 243 F.Supp.2d 1347, 1357 (M.D. Fla. 2003.)

of limitations runs from the date that the tortious conduct ceases.[136]  "A continuing tort is 'established by continual tortious acts, not by continual harmful effects from an original, completed act.'"[137]

Plaintiffs contend that the transaction before the Court is a "unified offense" and "[o]ne must compare the sum of all payments transferred to [Properties, Inc.], and consider Defendants' claimed rights to future payments, with the costs incurred to build the golf courses, in order to determine if Defendants have profited from their self-dealing and, if so, how much."[138]  However, as discussed above, all of the payments transferred from Club, Inc. to Properties, Inc. have been made pursuant to the valid and enforceable Agreement, and thus, are not torts.

Moreover, based upon the unrefuted evidence that the membership prices and dues were fair and reasonable to Club, Inc., there is simply no tort or conduct that continued from before the limitations period ran.  Even if raising the prices of equity memberships could constitute a tort, the last increase occurred in January 2004 outside of the limitations period. For the continuing torts doctrine to be applicable there must be conduct occurring during the limitations period. Thus, because there was no increase during the four year limitation period the continuing torts doctrine has no applicability.[139]

---

[136] Id.

[137] Suarez v. City of Tampa, 987 So.2d 681, 686 (Fla. Dist. Ct. App. 2008.)

[138] Doc. 241 at 22.

[139] Any suggestion that the continuing tort was the failure to reduce membership prices after January 2004 also must fail because, as here, when a defendant's damage-causing act is completed, the existence of continuing damages does not present successive causes of action to support a theory of continuing tort. See, Suarez v. City of Tampa, 987 So.2d 681, 686 (Fla. Dist. Ct. App. 2008).

Accordingly, the Court concludes that to the extent Plaintiffs' claims are based upon acts or omissions that occurred prior to June 13, 2004, the claims are time barred.

## II. CONCLUSION

In view of the foregoing, Defendants' Motion To Dismiss (Doc. 198) is **GRANTED**. Richard O. Conboy is dismissed as a derivative plaintiff in this case for lack of subject matter jurisdiction. Final judgment in favor of Defendants Stanley C. Olsen, Marina Taylor and Joseph G. Cappuccilli with regard to the claims of Plaintiffs, Robert H. Thune and Janet B. Thune in Count One of the Second Amended Complaint is due to be entered. Further, because the Court previously dismissed counts II and III in its summary judgment order as to all Defendants and dismissed Plaintiffs' claims based on self-dealing only as to Defendants Taylor and Cappuccilli, all claims by Plaintiffs against Defendants have been resolved and, accordingly, the Clerk is directed to enter final judgment in favor of Defendants as to all claims by Plaintiffs, with costs to be taxed in accordance with applicable law. The Clerk is further directed to terminate all pending motions and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on July 23, 2010.

_____
GARY R. JONES
United States Magistrate Judge

Copies to:

    All Counsel